## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

### Holding a Criminal Term

### Grand Jury Sworn in on May 7, 2012

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : CRIMINAL NO. 12-cr-00061 (RWR) |
| | : |
| **v.** | : VIOLATIONS: |
| | : |
| **PARVIZ KHAKI (a/k/a "Martin") and** | : 50 U.S.C. § 1705 |
| | : (Conspiracy to Violate International |
| **ZONGCHENG YI (a/k/a "Yi Cheng,"** | :  Emergency Economic Powers Act) |
| **a/k/a "Kohler," a/k/a "Kohler Yi"),** | : |
| | : 18 U.S.C. § 371 |
| **Defendants.** | : (Conspiracy to Defraud U.S. Government) |
| | : |
| | : 18 U.S.C. § 554 |
| | : (Smuggling) |
| | : |
| | : 50 U.S.C. § 1705 |
| | : (International Emergency Economic |
| | :  Powers Act) |
| | : |
| | : 31 C.F.R. Part 560 |
| | : (Iranian Transactions Regulations) |
| | : |
| | : 18 U.S.C. § 1956 |
| | : (Conspiracy to Commit Money |
| | :  Laundering) |
| | : |
| | : 18 U.S.C. § 2 |
| | : (Aid and Abetting) |
| | : |
| | : 18 U.S.C. § 982(a)(1); 28 U.S.C. § 2461(c) |
| | : (Criminal Forfeiture) |

### <u>INDICTMENT</u>

THE GRAND JURY CHARGES THAT:

## COUNT ONE
## 50 U.S.C. § 1705
### (Conspiracy to Violate International Emergency Economic Powers Act)

At all times relevant to this Indictment:

### Introduction

1.      Defendant PARVIZ KHAKI, a/k/a Martin ("KHAKI"), was a citizen of Iran.
KHAKI procured and attempted to procure United States goods for customers located in Iran,
including goods that can be used to construct, operate, and maintain gas centrifuges to enrich
uranium.  KHAKI also attempted to procure radioactive materials from the United States for
customers located in Iran.

2.      Defendant ZONGCHENG YI, a/k/a Yi Cheng, a/k/a Kohler, a/k/a Kohler Yi
("YI"), was a resident of the People's Republic of China ("China").  YI assisted KHAKI in
procuring United States goods that can be used to construct, operate, and maintain gas
centrifuges to enrich uranium, and exporting those goods to Iran.  YI purported to be the
managing director of Monalila Co. LTD, a company located in Guangzhou City, China
("Monalila").

3.      Unindicted coconspirator 1 ("Conspirator 1") was a citizen and resident of the
United States.  Conspirator 1 assisted KHAKI in procuring United States goods and exporting
those goods to Iran.

4.      Unindicted coconspirator 2 ("Conspirator 2") was located in the Philippines.
Conspirator 2 assisted KHAKI in procuring United States goods and exporting those goods to
Iran.

5.      The following items can be used to construct a device capable of producing or utilizing atomic energy materials, such as a gas centrifuge to enrich uranium: C-350 maraging steel, 7075-O aluminum alloy, Arnokrome III magnetic tape, thermal ionization mass spectrometer, magnetic mass spectrometer for isotopic analysis of uranium hexafluoride, DSP gauss meter, TCH600 nitrogen/hydrogen/oxygen analyzer, and certain vacuum pumps, accessories, valves, and gauges.

6.      Maraging steel is a special class of high-strength steel known for possessing superior strength without losing malleability.  The enhanced strength of maraging steel allows for the development of gas centrifuges for uranium enrichment.

7.      Uranium hexaflouride ($UF_6$) is the chemical compound used in the gas centrifuge process to enrich uranium. There are two major isotopes of uranium, $U^{235}$, which is ideal for both nuclear weapons and nuclear reactors, and $U^{238}$.  Although the two isotopes are chemically identical, their mass differs.  The gas centrifuge process seeks to exploit this mass difference to separate the $U^{235}$ from the $U^{238}$.  The uranium isotopes need to be in a gaseous form to facilitate their movement, and thus their separation. The gas centrifuge enrichment process requires that uranium be converted into uranium hexaflouride since it is the uranium compound that can most easily be converted into a gas. Once converted into a gas, separation of the two uranium isotopes can occur by slinging the gas around in a high speed gas centrifuge. The uranium hexaflouride molecules that contain the heavier $U^{238}$ isotope sling out farther than the uranium hexaflouride molecules containing the lighter $U^{235}$ isotope, and thus separation can be achieved.

8.      Radioactive material is material that spontaneously emits radiation, either directly from unstable atomic nuclei or as a consequence of a nuclear reaction. The following items are

radioactive materials: barium-133 source, europian-152 source, cobalt-57 source, and cadmium-109 source.

## Export and Shipping Records

9.      Pursuant to United States law and regulations, exporters, shippers, and freight forwarders are required to file certain forms and declarations concerning exports of goods and technology from the United States. Typically, those documents are filed electronically through the Automated Export System ("AES"), which is administered by the United States Department of Homeland Security ("DHS"), Customs and Border Protection, which is headquartered in the District of Columbia.

10.     A Shipper's Export Declaration ("SED") was an official document submitted to DHS in connection with export shipments from the United States.  These forms were used by the United States Bureau of Census to collect trade statistics and by the Bureau of Industry and Security ("BIS"), Department of Commerce, which is located in the District of Columbia, for export control purposes.

11.     An essential and material part of the SED and AES, as well as other export filings, is information concerning the end-user or ultimate destination of the export.  The identity of the end-user may determine whether the goods may be exported: (a) without any specific authorization from the United States Government; (b) with the specific authorization or license from the United States Department of the Treasury, United States Department of State, or United States Department of Commerce; or (c) whether the goods may be prohibited for export from the United States.

12.     Statements made on these export filings are statements to the United States

government that the transaction occurred as described.  Other United States government agencies

located in the District of Columbia and elsewhere also rely upon the information provided by

AES records.

**International Emergency Economic Powers Act**

13.     The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C.

§§ 1701-1707, authorized the President to impose economic sanctions on a foreign country in

response to an unusual or extraordinary threat to the national security, foreign policy, or economy

of the United States when the President declares a national emergency with respect to that threat.

14.     On March 15, 1995, the President issued Executive Order 12957, finding that "the

actions and policies of the Government of Iran constitute an unusual and extraordinary threat to

the national security, foreign policy, and economy of the United States," and declared "a national

emergency to deal with that threat."  Executive Order 12957, as expanded and continued by

Executive Orders 12959 and 13059 and successive Presidential notices, was in effect at all times

relevant to this Indictment.

15.     On May 6, 1995, the President issued Executive Order 12959 and imposed

economic sanctions, including a trade embargo, against Iran ("the Iran Trade Embargo").  On

August 17, 1997, the President issued Executive Order 13059, renewing the Iran Trade Embargo,

which continued throughout the time of the acts set forth herein.

16.     To implement the Iran Trade Embargo, the United States Department of the

Treasury, through the Office of Foreign Assets Control ("OFAC"), located in the District of

Columbia, issued the Iranian Transactions Regulations ("ITR") (31 C.F.R. Part 560).  With

certain limited exceptions not applicable here, the ITR prohibit, among other things, the export, re-export, sale, or supply, directly or indirectly, from the United States or by a United States person wherever located, to Iran or the Government of Iran, or the financing of such export, re-export, sale, or supply, of any goods, technology, or services, without prior authorization from OFAC.  These regulations further prohibit any transactions that evade or avoid or have the purpose of evading or avoiding any of the prohibitions contained in the ITR, including the unauthorized exportation of goods from the United States to a third country if the goods are intended or destined for Iran.

17.     The Iran Trade Embargo and the ITR were in effect at all times relevant to this Indictment.

18.     At all times relevant to this Indictment, Defendants KHAKI, YI, and their coconspirators did not apply for, receive, or possess a license or authorization from OFAC to export goods, technology, or services, of any description, to Iran.

**Venue**

19.     The conduct alleged in this Indictment began outside of the jurisdiction of any particular State or district, and later occurred within the District of Columbia and elsewhere, and is therefore within the venue of the United States District Court for the District of Columbia, as provided by 18 U.S.C. §§ 3237(a) and 3238.

**The Conspiracy**

20.     Beginning as early as in or around October 2008, the exact date being unknown to the Grand Jury, and continuing through at least January 2011, the exact date being unknown to the Grand Jury, beginning outside of the jurisdiction of any particular State or district and later

occurring within the District of Columbia and elsewhere, defendants, **PARVIZ KHAKI (a/k/a "Martin")** and **ZONGCHENG YI (a/k/a "Yi Cheng," a/k/a "Kohler," a/k/a "Kohler Yi")**, did knowingly and willfully combine, conspire, confederate and agree with others known and unknown to the Grand Jury, to export and cause the exportation of goods from the United States to Iran in violation of the embargo imposed upon that country by the United States, without having first obtained the required licenses or authorizations from the Department of the Treasury, OFAC, in violation of Title 50, United States Code, Section 1705, and Title 31, Code of Federal Regulations, Sections 560.203 and 560.204.

## I.      Objects of the Conspiracy

21.      The objects of the conspiracy were:

a.      to obtain money and property by exporting and causing to be exported US-origin goods in violation of United States law;

b.      to conceal the prohibited activities and transactions from detection by the United States Government so as to avoid penalties and disruption of the illegal activity;

c.      to evade the prohibitions and licensing requirements of the International Emergency Economic Powers Act and the Iranian Transactions Regulations; and

d.      to provide items to Iran that can be used to construct, operate, and maintain gas centrifuges to enrich uranium.

## II.      Manner and Means of the Conspiracy

22.      The manner and means by which the defendants and their coconspirators sought to accomplish the objects of the conspiracy included, among others, the following:

a.      Defendants KHAKI, YI, Conspirator 1, Conspirator 2, and others used email accounts and other forms of communication to communicate with each other, with other conspirators, and with others located in the United States, China, and Iran.

b.      Defendant KHAKI directed Defendant YI, Conspirator 1, and others to contact United States companies about purchasing United States-origin goods, in order to hide the fact that the end user of the goods was located in Iran.

c.      Defendant YI, Conspirator 1, Conspirator 2, and others sent requests for price quotes for U.S.-origin goods on behalf of Defendant KHAKI and other conspirators located in Iran.

d.      Defendant YI, Conspirator 1, Conspirator 2, and others placed orders and purchased United States-origin goods from United States companies on behalf of Defendant KHAKI and other conspirators located in Iran.

e.      Defendants KHAKI, YI, Conspirator 1, and Conspirator 2 engaged in acts of dishonesty, deceit, and false pretenses in order to obtain money and property by exporting United-States origin goods from the United States to Iran through Hong Kong, China and the Philippines, with knowledge that the export of United States-origin goods to Iran without a license violated United States law.

f.      Defendant YI, Conspirator 1, Conspirator 2, and others, on behalf of Defendant KHAKI and other conspirators located in Iran made misrepresentations and false statements to United States companies to convince the United States companies that no license was required by the United States government in order to ship United States-origin goods to a third country.

-8-

g.     Defendant YI, Conspirator 1, Conspirator 2, and others, on behalf of Defendant KHAKI and other conspirators located in Iran made misrepresentations and false statements to United States companies to convince the United States companies to ship United States-origin goods to a third country.

h.     Defendant YI caused funds to be used for the purchase of United States-origin goods from United States companies on behalf of Defendant KHAKI and other conspirators located in Iran.

i.     Defendant YI and Conspirator 1 caused the United States-origin goods to be exported from the United States to Defendant KHAKI and other conspirators in Iran, by way of China and Hong Kong, without obtaining the requisite licenses from the respective export control authorities.

**III.     Overt Acts in Furtherance of the Conspiracy**

23.     Beginning outside of the jurisdiction of any particular State or district, and later occurring within the District of Columbia and elsewhere, in furtherance of the conspiracy and to effect the illegal objects thereof, the defendants, **PARVIZ KHAKI (a/k/a "Martin")** and **ZONGCHENG YI (a/k/a "Yi Cheng," a/k/a "Kohler," a/k/a "Kohler Yi")**, and others known and unknown to the Grand Jury, committed the following overt acts and caused them to be committed, among others:

**Efforts to Illegally Export to Iran Items to Construct
a Gas Centrifuge for Uranium Enrichment**

*C-350 Maraging Steel*

(1)     On or about December 6, 2008, KHAKI asked an individual located in China ("Individual 1") to obtain twenty (20) tons of C-350 maraging steel from the United States for KHAKI's customer in Iran.

(2)     On or about December 10, 2008, in response to a question about the end user of the maraging steel, KHAKI informed Individual 1 that the C-350 maraging steel was for a company in Iran.

(3)     On or about December 11, 2008, Individual 1 emailed KHAKI that he did not have any samples of C-350 maraging steel because it is strictly limited by the United States and requires an export license.

(4)     On or about December 22, 2008, KHAKI sent an email to Individual 1, stating that KHAKI would send Individual 1 his address in Iran.  KHAKI discussed sending a payment for a sample of the maraging steel.

(5)     On or about December 22, 2008, Individual 1 responded to KHAKI's email. Individual 1 conveyed to KHAKI that a United States company that sells C-350 maraging steel and with whom Individual 1 had been exchanging emails ("Company 1"), needed information about the end use of the maraging steel and confirmation that the maraging steel would not be used for nuclear activities.

(6)     On or about February 14, 2009, YI, located in China, forwarded to KHAKI email communications between YI and a sales manger for Company 1.  In the forwarded emails, YI had

-10-

asked the sales manager for the price and deliver times for exporting 20 tons of maraging steel. The sales manager informed YI that Company 1 needed to know the end use application for the maraging steel because it is "controlled for export by US Government."

(7)     On or about March 2, 2009, YI forwarded KHAKI a price quotation from Company 1 for over 20 tons of maraging steel.  The quotation states that maraging steel is "controlled for export by the United States government."

(8)     On or about March 20, 2009, KHAKI began communicating with an individual who represented he had experience exporting items illegally out of the United States, but who in actuality was an undercover federal agent.  The undercover federal agent told KHAKI that Company 1 could not sell KHAKI the maraging steel because exporting the maraging steel was illegal, but that the undercover agent could help export the item for a fee.  KHAKI replied to the undercover federal agent with questions about price and payment.

(9)     On or about May 14, 2009, KHAKI emailed the undercover federal agent in his continued efforts to acquire and export the maraging steel to Iran.  KHAKI remarked that "you know and I know this material are [sic] limited material and danger goods but another provider are here and they have connection out of iran . . ."  KHAKI also discussed his motivation to make money from this transaction.

(10)    From or about May 25 to December 8, 2009, KHAKI asked the undercover federal agent for his banking information and continued to discuss logistics for purchasing the maraging steel.

*Other Raw Materials*

(11)    On or about November 29, 2008,  KHAKI contacted Individual 1 about procuring twenty (20) tons of 7075-O aluminum alloy in rods with a diameter of 80mm.  KHAKI specifically requested that the rods be from the United States or Europe.

(12)    On or about December 10, 2008, KHAKI explained to Individual 1 that his customer "want just brand usa" because they had previously found that Chinese aluminum alloy is of poor quality. Attached to the email were specifications for 20 metric tons of 7075-O aluminum alloy 80mm rods and 20 tons of 7075-T6 aluminum alloy 150mm rods.

(13)    On or about December 21, 2008, Individual 1 quoted KHAKI prices of $6,637.65 USD/ton for the 7075-O aluminum alloy and $6,972.94 USD/ton for the 7075-T6 aluminum alloy.

(14)    On or about February 7, 2009, KHAKI contacted a magnetics company in China about purchasing a metallic strip foil similar in dimensions and physical properties of Arnokrome III, which is a magnetic tape that can be used in gas centrifuges. KHAKI stated that the material would be used in a high speed motor capable of more than 70,000 RPM.

(15)    On or about March 29, 2009, Khaki requested that the undercover federal agent help KHAKI obtain Arnokrome III magnetic tape from the U.S. manufacturer located in Illinois.

(16)    On or about April 10, 2009 a representative of the Chinese magnetics company advised KHAKI that the U.S. manufacturer of Arnokrome III had not responded to them and suggested that KHAKI directly contact the U.S. manufacturer.

*Mass Spectrometers*

(17)    On or about May 17, 2009, KHAKI sent the undercover federal agent a request to purchase two types of mass spectrometers – a thermal ionization mass spectrometer and a magnetic mass spectrometer. Spectrometers are used to analyze the molecular composition of materials. The attachment to the email stated that the magnetic mass spectrometer was for the "Isotopic Analysis of gaseous $UF_6$ [uranium hexaflouride]."

*Measuring Instruments*

(18)    On or about October 27, 2008, KHAKI contacted an individual in Sweden about procuring magnetic gauging equipment. KHAKI provided the individual with a hyperlink for a U.S. company located in Ohio.

(19)    On or about November 14, 2008, the individual in Sweden informed KHAKI that the gauss meter would have to be shipped from the United States. A gauss meter, as known as a magnetometer, is an electronic instrument for measuring the strength of magnetic fields.

(20)    On November 25, 2008, an individual in China provided KHAKI with a price quote for a DSP gauss meter. The individual in China informed KHAKI that the seller required that the individual attest to the fact that (i) he was not just a middleman, but rather the end user, (ii) the products would only be used in China, and (iii) "the products will not be used for biological weapo[n], chemical weapon, nuclear weapon, etc." The formal quote provided by the company, which was attached to the email, stated that the sale was subject to the "rules of the Bureau Of Export Administration U.S. Department of Commerce."

(21)    On or about August 13, 2009, KHAKI emailed Conspirator 2 in the Philippines a request for prices of several products including a TCH600 nitrogen/hydrogen/oxygen analyzer, which is manufactured and distributed by a U.S. company located in Michigan.

(22)    On or about August 14, 2009, Conspirator 2 informed KHAKI that she falsely told the seller in the Philippines that the analyzer would be installed in the Philippines.

(23)    On or about August 14, 2009, Conspirator 2 informed YI that she was looking for an entity in the Philippines to falsely present as the end user of the analyzer. She told YI that she "might even use some influential friends here who are close to the administration."

(24)    On or about August 17, 2009, Conspirator 2 contacted KHAKI to tell him that the seller in the Philippines would have to buy the analyzer from a U.S. company in Michigan. Conspirator 2 also stated that she would be looking for assistance of "politicians or bigtime businessmen in this particular deal and to give them profit, or under-the-table deals."

(25)    On or about August 20, 2009, KHAKI asked the undercover federal agent for help ordering the TCH600 analyzer.

*Vacuum System Equipment*

(26)    On or about February 3, 2009, KHAKI asked YI to get pricing and delivery times for multiple items manufactured by a U.S. company located in Massachusetts, including two models of MKS Baratron pressure transducers (model # 626A01TDD and 626A11TDD).  These pressure transducers are ideal for measuring gas pressure within gas centrifuge piping systems. KHAKI instructed YI to conceal that the end users of the transducers were in Iran.

(27)    On or about February 10, 2009, YI sent KHAKI a price quote for the pressure transducers and other items.

(28)   On or about June 24, 2009, KHAKI directed YI to procure an extensive list of vacuum pumps and accessories, which could be used in the assembly of a large vacuum pump system. Among other items, the request included:

- Trivac 65B vacuum pump
- Trivac D16 rotary pump
- Dow Corning sealing greases
- Dow Corning 704 diffusion oil
- Leybold ball valve DN 40 ISO-KF (model # 174-97)
- Leybold ball value DN 25 ISO-KF (model # 174-96)
- Leybold high vacuum gauge (model # 230-070)
- Leybold pirani vacuum gauge (model # 230-026)
- Leybold Center Two displayer

KHAKI instructed YI to not tell the seller that the end user was in Iran.

(29)   On or about July 29, 2009, KHAKI asked the undercover federal agent to procure several types of vacuum pumps and accessories, including all of the above-listed items. KHAKI asked the undercover federal agent to buy the items from a company in the United States.

(30)   On or about January 19, 2010, KHAKI emailed YI to asked for a quote for an industrial-sized GNB G(630)P high vacuum gate valve from a U.S. company located in California.

**Efforts to Illegally Export Radioactive Materials to Iran**

(31)   On or about May 13, 2009, KHAKI sent the undercover federal agent an email asking the agent to purchase radioactive sources and test materials from a U.S. company located in Connecticut. Attached to the email was a list of products, including barium-133 source and europium-152 source. KHAKI also attached the contact information for Connecticut company's U.S. headquarters.

-15-

(32)     On or about January 7, 2011, KHAKI asked the undercover federal agent in an email whether he could "provide us some goods of this company." Attached to the email was a product catalogue for radioactive sources including cobalt-57 source.

(33)     On or about January 11, 2011, KHAKI emailed the undercover federal agent a request for cadmium-109 source.

### Export of Lathes to Iran through Hong Kong, China

(34)     On or about February 1, 2009, KHAKI asked YI to contact a company located in the United States ("Company 2") about the price of two (2) twister speed lathes ("lathes") and how long it would take to deliver the lathes to Monalila, located in China.  KHAKI acknowledged that the actual end user of the lathes was in Iran, explaining to YI that the lathes are "limited" for Iran because they are made in the United States.

(35)     On or about March 2, 2009, YI forwarded to KHAKI an official invoice from Company 2 for the two lathes.

(36)     On or about March 2, 2009, KHAKI emailed Conspirator 1 the official invoice for the lathes.  KHAKI asked Conspirator 1 to vet Company 2 to make sure they were a "true" company.  KHAKI acknowledged to Conspirator 1 that after YI received the lathes in China, YI was going to send them to Iran.

(37)     On or about March 4, 2009, YI asked Company 2 that when Company 2 ships the lathes to China, to record the value of the lathes as less than the actual amount, in order to avoid fees from customs.

(38)     On or about April 13, 2009, YI asked Company 2 to ship the lathes to a trading company located in Hong Kong ("Hong Kong Company").

(39)     On or about April 20, 2009, YI sent KHAKI an email confirming that once YI received the lathes in Hong Kong, he would ship them to KHAKI's address in Iran.

(40)     On or about May 22, 2009, YI transferred money for the lathes from a bank in China ("China Bank") to Company 2.

(41)     On or about June 2, 2009, YI received the lathes from Company 2.  Two days later, YI shipped the lathes to Iran.

### Export of Nickel Alloy Wire to Iran through Hong Kong, China

(42)     On or about January 26, 2009, KHAKI asked Conspirator 1 to contact a company located in the United States ("Company 3") about purchasing nickel alloy 120 wire.

(43)     On or about January 27, 2009, Conspirator 1 sent Company 3 a request for a price for nickel alloy 120.   Upon receipt of the price quote, Conspirator 1 forwarded the quote to KHAKI.

(44)     On or about February 1, 2009, KHAKI asked Conspirator 1 to ask Company 3 how much it would cost to ship the nickel alloy to China.

(45)     On or about February 3, 2009, Company 3 emailed Conspirator 1 the price for shipping the nickel alloy to China.  The email states that the shipment must have customs documents attached, including a Shipper's Export Declaration.  Conspirator 1 forwarded this email to KHAKI.

(46)     On or about February 15, 2009, in order to provide Company 3 with an end user address for the nickel alloy, KHAKI instructed YI to send Conspirator 1 the address for Monalila.

(47)     On or about April 16, 2009, Conspirator 1 sent Company 3 a purchase order for the nickel alloy, which falsely stated that Monalila was the purchaser.

(48)    On or about April 20, 2009, KHAKI sent an email to YI complaining that if he did

not receive the nickel alloy in the next few weeks, he would have to pay a fine "to customer in

iran."

(49)    On or about April 22, 2009, KHAKI informed Conspirator 1 that the payment to

Company 3 would be sent from China because he wants Company 3 to believe, falsely, that the

end user is in China.

(50)    On or about April 30, 2009, YI asked Company 3 to ship the nickel alloy to the

Hong Kong Company.

(51)    On or about May 6, 2009, YI transferred money for the nickel alloy from China

Bank to Company 3.

(52)    On or about June 2, 2009, Company 3 shipped the nickel alloy to YI at the Hong

Kong Company.  The invoice included in the shipment stated that the nickel alloy was subject to

United States export laws and diverting the nickel alloy to another country was prohibited by

United States law.

(53)    On or about June 15, 2009, YI shipped the nickel alloy to Iran.

**Failure to Obtain a License from the United States Government**

(54)    At no point during any of the transactions described in the overt acts enumerated

above did the defendants or their known coconspirators apply for or receive a license or other

authorization from the Office of Foreign Assets Control, United States Department of the

Treasury, located in the District of Columbia, to export directly or indirectly C-350 maraging

steel, 7075-O aluminum alloy, Arnokrome III magnetic tape, thermal ionization mass

spectrometer, magnetic mass spectrometer for isotopic analysis of uranium hexafluoride, DSP

gauss meter, TCH600 nitrogen/hydrogen/oxygen analyzer, and vacuum pumps, accessories,

valves, and gauges, lathes or nickel alloy 120 from the United States to Iran.

All in violation of Title 50, United States Code, Section 1705.

## COUNT TWO
## 18 U.S.C. § 371
### (Conspiracy to Defraud the United States Government)

1.      The Grand Jury realleges and incorporates by reference the allegations in

Paragraphs 1 through 23.

2.      Beginning as early as in or around October 2008, the exact date being unknown to

the Grand Jury, and continuing through at least January 2011, the exact date being unknown to

the Grand Jury, beginning outside of the jurisdiction of any particular State or district and later

occurring within the District of Columbia and elsewhere, defendants, **PARVIZ KHAKI (a/k/a**

**"Martin")** and **ZONGCHENG YI (a/k/a "Yi Cheng," a/k/a "Kohler," a/k/a "Kohler Yi")**,

did knowingly and willfully combine, conspire, confederate and agree with others known and

unknown to the Grand Jury, to defraud the United States Department of the Treasury and the

United States Government by interfering with and obstructing a lawful government function by

deceit, craft, trickery, and dishonest means in violation of Title 18, United States Code, Section

371.

## COUNTS THREE AND FOUR
## 18 U.S.C. § 554
### (Smuggling)

1.      The Grand Jury realleges and incorporates by reference the allegations in

Paragraphs 1 through 23.

2.      On or about the dates listed as to each count below, beginning outside of the

jurisdiction of any particular State or district, and later within in the District of Columbia and elsewhere, the defendants, **PARVIZ KHAKI (a/k/a "Martin")** and **ZONGCHENG YI (a/k/a "Yi Cheng," a/k/a "Kohler," a/k/a "Kohler Yi")**, did knowingly and fraudulently export and send from the United States, merchandise, articles, and objects, as described more fully below in Counts 3 and 4, contrary to the laws and regulations of the United States, specifically, Title 50, United States Code, Section 1705, and Title 31, Code of Federal Regulations, Parts 560.203 and 560.204:

| COUNT | APPROX. DATE OF EXPORT | U.S.-ORIGIN GOODS |
|---|---|---|
| 3 | May 28, 2009 | Twister Speed Lathe (2) |
| 4 | June 2, 2009 | Nickel Alloy 120 |

All in violation of Title 18, United States Code, Section 554 and Title 18, United States Code, Section 2.

### COUNTS FIVE AND SIX
### 50 U.S.C. § 1705
### (Illegal Export of U.S. Goods to Iran)

1.     The Grand Jury realleges and incorporates by reference the allegations in Paragraphs 1 through 23.

2.     On or about the dates listed as to each count below, beginning outside of the jurisdiction of any particular State or district, and later within in the District of Columbia and elsewhere, the defendants, **PARVIZ KHAKI (a/k/a "Martin")** and **ZONGCHENG YI (a/k/a "Yi Cheng," a/k/a "Kohler," a/k/a "Kohler Yi")**, did knowingly and willfully violate United States laws with respect to the embargo against Iran by exporting and causing to be exported

U.S.-origin goods, as described more fully below in Counts 5 and 6, from the United States to

Iran, by way of Hong Kong, China, without having first obtained the required licenses and

authorizations from the  Office of Foreign Assets Control, United States Department of the

Treasury, located in the District of Columbia:

| COUNT | APPROX. DATE OF EXPORT | U.S.-ORIGIN GOODS |
|:-----:|:----------------------:|:-----------------:|
| 5 | May 28, 2009 | Twister Speed Lathe (2) |
| 6 | June 2, 2009 | Nickel Alloy 120 |

All in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal

Regulations, Sections 560.203 and 560.204; and Title 18, United States Code, Section 2.


**COUNT SEVEN**
**18 U.S.C. § 1956**
**(Conspiracy to Commit Money Laundering)**

1.      The Grand Jury realleges and incorporates by reference the allegations in

Paragraphs 1 through 23.

2.      Beginning as early as in or around October 2008, the exact date being unknown to

the Grand Jury, and continuing through at least January 2011, beginning outside of the

jurisdiction of any particular State or district, and later within the District of Columbia, and

elsewhere, the defendants, **PARVIZ KHAKI (a/k/a "Martin")** and **ZONGCHENG YI (a/k/a**

**"Yi Cheng," a/k/a "Kohler," a/k/a "Kohler Yi")**, and others known and unknown to the Grand

Jury, did unlawfully, wilfully, and knowingly combine, conspire, and agree with each other to

commit offenses against the United States in violation of Title 18, United States Code, Section

1956, specifically, to transport, transmit, and transfer, and attempt to transport, transmit, and

transfer, a monetary instrument and funds, specifically $6,442, to a place in the United States

from a place outside the United States, with the intent to promote the carrying on of specified

unlawful activity, to wit, illegally exporting U.S.-origin goods from the United States to Iran in

violation of Title 18, United States Code, Section 554, Title 50, United States Code, Section

1705, and Title 31, Code of Federal Regulations, Parts 560.203 and 560.204.

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and (h).


FORFEITURE ALLEGATION

1.      The violations alleged in Count One through Count Seven of this Indictment are

re-alleged and incorporated by reference herein for the purpose of alleging forfeiture to the

United States of America pursuant to the provisions of Title 18, United States Code, Section

981(a)(1)(C), Title 18, United States Code, Section 982(a)(1), and Title 28, United States Code,

Section 2461(c).

2.      As a result of the offenses alleged in Count One through Count Seven of this

Indictment, defendants shall forfeit to the United States any property constituting, or derived

from, proceeds obtained directly or indirectly, as the result of the offenses alleged in Count One

through Count Five, and any property involved in the offense alleged in Count Six, and any

property traceable to such property, including, but not limited to:

Money Judgment:

a sum of money of at least $6,442, which represents a sum of money equal to property

constituting, or derived from, proceeds obtained, directly or indirectly, as the result of the

offenses alleged in Count One through Count Six of this Indictment.

3.      By virtue of the commission of the felony offenses charged in Count One through Count Six of this Indictment, any and all interest that defendants have in property constituting, or derived from, proceeds obtained directly or indirectly, as the result of such offenses is vested in the United States and hereby forfeited to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

4.      By virtue of the commission of the felony offense charged in Count Seven of this Indictment, any and all interest that defendants have in any property involved in the offense, and any property traceable to such property, is vested in the United States and hereby forfeited to the United States pursuant to Title 18, United States Code, Section 982(a)(1).

5.      If, as a result of any act or omission of the defendants, the property identified above:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third person;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property that cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b)(1), incorporating by reference Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the said defendants up to the value of said property listed above as being subject to forfeiture.

All in violation of Title 18, United States Code, Section 981(a)(1)(C); Title 18, United States Code, Section 982(a)(1); and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

_____
FOREPERSON

Attorney of the United States in
and for the District of Columbia